## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| TIGER GROUP LLC for itself and on behalf of those similarly situated<br><br>**Plaintiff,**<br><br>**v.**<br><br>ACEROS DE AMERICA, INC.; CAROLINA BUILDING MATERIALS, INC.; CAROLINA BUILDLING LLC; STEEL SERVICES & SUPPLIES, INC.; THYSSENKRUPP MATERIALS TRADING GMBH a/k/a THYSSENKRUPP MANNEX GMBH; THYSSENKRUPP MATERIALS N.A., INC., THYSSENKRUPP AG; JUAN C. APONTE-TOLENTINO; EDGARDO SOLA-COLON; FRANCIS GARCIA- HAGHVERDIAN; NORBERT GOERTZ; RALF GENDRUSCHKE; CO-CONSPIRATOR ENTITIES A through Z; CO-CONSPIRATOR INDIVIDUALS 1 through 25; INSURERS XYZ<br><br>**Defendants** | **Civil No. 24cv1360(PAD)**<br><br>Class Action Complaint; Sherman Act; Clayton Act; Trial by Jury |

### FIRST AMENDED CLASS ACTION COMPLAINT

**TO THE HONORABLE COURT:**

 **COMES NOW,** plaintiff Tiger Group LLC, on its own stead and on behalf of those similarly situated, trough the undersigned counsel, and respectfully STATES, ALLEGES and PRAYS as follows:

### INTRODUCTION

1. This class action complaint is brought by Plaintiff, Tiger Group LLC, on behalf of itself and all others similarly situated against Defendants Aceros de America, Inc. ("Aceros"), Carolina Building

Materials, Inc. ("CBM"), Carolina Buildling LLC ("CB"), Steel Services & Supplies, Inc. ("SSS"), and ThyssenKrupp AG, ThyssenKrupp Mannex GmbH a/k/a ThyssenKrupp Materials Trading GmbH, ThyssenKrupp Materiarls N.A., Inc. (hereafter collectively "ThyssenKrupp"), Juan C. Aquino-Tolentino, Edgardo Sola-Colon, Francis Garcia-Haghverdian, Norbert Goertz, Ralf Gendruschke, and the fictitiously named defendants for engaging in illegal price-fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for violating Section 7 of the Clayton Act, 15 U.S.C. § 12-27, by substantially lessening competition and creating a monopoly in the steel distribution market in Puerto Rico and other affected regions   by substantially lessening competition and conspiring to fix prices of rebar and other steel products in Puerto Rico and other affected regions.

**2.**      The illegal price-fixing and customer/market allocation conspiracy was carried out over an eight-year period, between 2015 and 2022, during which Defendants, acting in concert, fixed, raised, maintained, and stabilized prices for steel products sold to customers, including contractors and businesses in Puerto Rico and beyond. This conduct resulted in inflated prices, restricting competition, harming consumers and creating an artificial pricing structure which increased the cost of reconstruction efforts after Hurricane María.

**3.**      Plaintiff seeks to represent all persons and entities who, during the period from and including 2015 through such time as the anticompetitive effects of Defendants' conduct ceased ("Class Period"), purchased steel products (mainly rebar used in construction) from Defendants, or any current or former subsidiary of a Defendant or any co-conspirator of Defendants.

**4.**      Defendants import, manufacture, market, and/or sell construction steel products throughout and into the Puerto Rico. Defendants and their co-conspirators (as yet unknown) agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, rig bids, and allocate the market and customers in Puerto Rico for steel products.

## JURISDICTION AND VENUE

**5.**     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, as this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

**6.**     This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (1) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants; and (2) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

**7.**     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391, because Defendants transact business in this District, and a substantial part of the events giving rise to the claims occurred in this District. The anticompetitive scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District, and throughout the United States. The anticompetitive scheme directly affects commerce in this District.

## PARTIES

**8.**     Plaintiff Tiger Group LLC is a Puerto Rico based construction contractor, who purchased steel products from the Defendants during the period of the alleged conspiracy and was injured by the inflated prices caused by Defendants' illegal activities.

**9.**     Defendant Aceros de America, Inc. ("Aceros") is a Puerto Rican corporation with its principal place of business in Road #1, KM 25.0, San Juan, PR, 00726. Aceros is engaged in the importation, sale and distribution of steel products throughout Puerto Rico and other regions.

**10.** Defendant, Juan C. Aponte-Tolentino, was at all relevant times vice-president and interim president of Aceros who conspired and colluded with the remaining defendants to fix prices of steel products as well as allocate market and customers in Puerto Rico as alleged hereafter in detail.

**11.** Defendant Carolina Building Materials, Inc. ("CBM") is a Puerto Rican corporation with its principal place of business in Rd. 860 Km 1, Bo Martin Gonzalez, Carolina, Puerto Rico, 00984. CBM is in the business of importation, distribution and sale of steel products, including rebar used in construction in Puerto Rico.

**12.** Defendant Carolina Building LLC ("CB") is a Puerto Rican limited liability company with its principal place of business in Rd. 860 Km 1, Bo Martin Gonzalez, Carolina, Puerto Rico, 00984. CB is in the business of importation, distribution and sale of steel products, including rebar used in construction in Puerto Rico.

**13.** Defendant Edgardo Sola-Colon is an individual who resides in Puerto Rico was the president of CBM at all relevant times. Sola-Colon was and still is a membrer with ownership interest of CB. Sola-Colon conspired and colluded with the remaining defendants to fix prices of steel products as well as allocate market and customers in Puerto Rico as alleged hereafter in detail.

**14.** Defendant Steel Services & Supplies, Inc. ("SSS") is a Puerto Rican corporation with its principal place of business in 109 Carr 865, Campanilla Ward, Toa Baja, Puerto Rico, 00949. SSS is in the business of importation, distribution and sale of steel products, including rebar used in construction in Puerto Rico.

**15.** Defendant Francis Garcia-Haghverdian ("Garcia") is the owner and president of SSS. Mr. Garcia was the treasurer of SSS until 2022, when his father, Francisco García-Alonso, who was the owner, founder and president of SSS, passed away. Mr. Garcia has been president of SSS since 2022. On information and belief, Mr. Garcia inherited 50% ownership in Aceros from his father after his

passing in 2022. Garcia conspired and colluded with the remaining defendants to fix prices of steel products as well as allocate market and customers in Puerto Rico as alleged hereafter in detail.

16. Defendant ThyssenKrupp AG is a German multinational conglomerate headquartered in Essen, Germany. ThyssenKrupp AG is one of the world's largest steel producers, with extensive operations in industrial engineering, materials trading, and steel production. ThyssenKrupp AG controls a vast network of subsidiaries and affiliates across the globe, including the steel distribution markets in Europe, the Americas, and Asia.

17. Defendant ThyssenKrupp Materials Trading GmbH, also known as ThyssenKrupp Mannex GmbH, is a wholly-owned subsidiary of ThyssenKrupp AG, engaged in the global trading of steel products and other industrial materials. This entity, headquartered in Germany, plays a pivotal role in the distribution and pricing strategies of ThyssenKrupp AG's steel products worldwide.

18. Defendant ThyssenKrupp Materials N.A., Inc. a/k/a and d/b/a ThyssenKrupp Materials North America is a division of ThyssenKrupp AG. The North American division focuses on providing solutions across various industries, including automotive, construction, and energy, through its wide range of products such as steel, elevators, and industrial services. ThyssenKrupp North America plays a crucial role in the ThyssenKrupp operations, driving growth mainly through mergers and acquisitions.

19. The ThyssenKrupp defendants, collectively referred to herein as "ThyssenKrupp", own 50% of Aceros and 100% of CBM, which operate as steel distribution entities in Puerto Rico. Along with SSS, these entities control over 70% of the steel product market in Puerto Rico, providing ThyssenKrupp with significant market power to influence prices, supply, and competition within the region.

20. ThyssenKrupp has, through its ownership and control of Aceros and CBM, and its collaborations, joint ventures and conspiracies with SSS, exercised dominant influence over the steel

rebar market in Puerto Rico and other affected regions, engaging in anti-competitive practices that have harmed consumers and businesses.

21. Defendant Norbert Goertz ("Goertz"), is an individual who, upon information and belief, resides in 326 Puritan Ave., Birmingham, Michigan 48009. Goertz is the Chief Executive Officer of ThyssenKrupp Materials N.A., Inc. and is also a member of the board of directors of CBM, Aceros, and other ThyssenKrupp related entities. Goertz also conspired and colluded with the remaining defendants to fix prices of steel products as well as allocate market and customers in Puerto Rico as alleged hereafter in detail.

22. Defendant Ralf Gendruschke ("Gendruschke"), is an individual who, upon information and belief, resides in 4657 White Oaks Drive, Troy, Michigan 48098. Gendruschke is the Head Of Corporate Controlling of ThyssenKrupp Materials N.A., Inc. and is also a member of the board of directors of CBM, Aceros, and other ThyssenKrupp related entities. Gendruschke also conspired and colluded with the remaining defendants to fix prices of steel products as well as allocate market and customers in Puerto Rico as alleged hereafter in detail.

23. Through their collective ownership and control of Aceros, CBM and CB, these defendants have exercised dominant influence over the steel market in Puerto Rico and other affected regions, engaging in anti-competitive practices that have harmed consumers and businesses.

## FACTUAL ALLEGATIONS

### Market Domination Through Concentration

24. The Defendants control over 70% of the steel rebar market in Puerto Rico. To accomplish such a dominant market share, Defendants have created a sophisticated intertwined network of entities which are commonly owned and/or operated by the same entities and individuals.

25. SSS was wholly owned by Francisco García-Alonso from inception until his demise in 2022. Garcia-Alonso was also SSS's president. On information and belief, the defendant Francis Garcia-

Haghverdian, son of Garcia-Alonso, became the sole shareholder of SSS and its president after his father's passing.

**26.** García-Alonso was also 50% owner of Aceros. ThyssenKrupp GA, ThyssenKrupp Materials Trading GmbH, or one of the many entities under the ThyssenKrupp defendants' control, own the other 50% of Aceros.

**27.** Defendants Norbert Goertz and Ralf Gendruschke are both directors of Aceros.

**28.** ThyssenKrupp Materials Trading GmbH is also 100% owner of CBM.

**29.** Defendants Norbert Goertz and Ralf Gendruschke are both directors of CBM.

**30.** Defendant Norbert Goertz is the Chief Executive Officer of ThyssenKrupp North America, Inc.

**31.** Goertz has a long career with ThyssenKrupp, primarily focused on mergers and acquisitions, and financial management in North America and Puerto Rico.

**32.** Goertz's responsibilities include overseeing corporate development and strategic decisions across various ThyssenKrupp subsidiaries, including those involved in steel distribution and services, such as Aceros and CBM. Given his role in mergers, acquisitions, and strategic corporate oversight, Goertz's involvement included overseeing or approving pricing strategies and operational directives that impacted pricing structures within the affiliated companies involved in the conspiracy.

**33.** As director of both Aceros and CBM, Goertz and Gendruschke have responsibilities over these companies' financial and operational strategies as part of their broader role within ThyssenKrupp Materials North America and other ThyssenKrupp entities.

### The ThyssenKrupp Monopolistic Business Model

**34.** ThyssenKrupp's dominance in the global steel production and supply market has enabled it to enforce and sustain the price-fixing conspiracy across its Puerto Rican subsidiaries. As one of the

world's leading steel producers, ThyssenKrupp has unparalleled access to resources, technology, and global distribution networks, which it leveraged to control the Puerto Rican market.

35.     From 2015 to 2022, ThyssenKrupp directed and enforced the price-fixing agreements through Aceros and CBM in conjunction with SSS. These agreements were systematically communicated to and implemented by ThyssenKrupp's executives, who ensured that Aceros, CBM and SSS adhered to the agreed-upon pricing strategies.

36.     For at least eight years, Defendants conspired to fix the prices of steel products sold in Puerto Rico and other affected regions, and to allocate customers and market share of the same steel products. This conspiracy involved secret agreements to artificially inflate prices, eliminate competition, and ensure that customers paid higher prices than they would have in a competitive market.

37.     ThyssenKrupp's global market power and influence extended beyond Puerto Rico, as its control over steel production and supply allowed it to manipulate the availability of steel products in the region. In 2021, ThyssenKrupp orchestrated a reduction in steel shipments to Puerto Rico, creating an artificial scarcity that justified further price increases. This strategy not only inflated prices but also maximized ThyssenKrupp's profits at the expense of Puerto Rican consumers and businesses.

38.     ThyssenKrupp's dominance in the global steel market has been well-documented. As one of the top steel producers worldwide, ThyssenKrupp has the capacity to produce millions of tons of steel annually, with a vast network of subsidiaries and affiliates that control a significant portion of the global steel supply. This dominance has allowed ThyssenKrupp to exercise substantial control over regional markets, including Puerto Rico, where it has imposed anti-competitive practices that have harmed the local economy and consumers.

39.     ThyssenKrupp, through its leadership, played a central role in orchestrating and sustaining the price-fixing conspiracy that controlled the Puerto Rican steel rebar market. ThyssenKrupp leveraged

its global market dominance to influence local pricing strategies, thereby maintaining its monopolistic control over the steel market in Puerto Rico.

40.     Thyssenkrupp is no stranger to price fixing and anticompetitive practices.  It has a history of engaging in such practices around the world.  The following are recent examples of some of the cases where ThyssenKrupp has been found to have engaged in illegal anti-competitive practices:

   a. **The European Elevator and Escalator Cartel (2007)**: In 2007, the European Commission fined ThyssenKrupp and other companies over €990 million for their involvement in a price-fixing cartel in the elevator and escalator market.  The companies were found guilty of colluding on prices, market sharing, and rigging bids for projects across several EU countries, including Germany, Belgium, Luxembourg, and the Netherlands.  ThyssenKrupp was fined over €479 million. This was one of the largest fines imposed by the European Commission at that time.

   b. **Steel Cartel in Brazil (2017):**  ThyssenKrupp was implicated in a price-fixing scheme in the Brazilian steel market.  The Brazil's Administrative Council for Economic Defense (CADE) investigated several steel companies, including ThyssenKrupp, for colluding on prices and market sharing.  The investigation into this cartel revealed that the companies, including ThyssenKrupp, manipulated bid processes for metro and commuter train projects, pretending to compete while secretly agreeing on prices and dividing up contracts.   CADE ended up imposing fines of $1.4 billion on ThyssenKrupp and the other members of the cartel.

   c. **The European Steel Cartel (2019)**: In 2019, ThyssenKrupp was fined by the European Commission again, this time for participating in a cartel involving specialty steel producers. The cartel was accused of coordinating prices and sharing sensitive market information to manipulate the prices of steel used in automotive and other

industries.  ThyssenKrupp was fined €370 million. The investigation revealed that the cartel operated for several years and included several major steel producers.

d. **The German Rail Cartel (2012)**: In Germany, ThyssenKrupp was involved in a price-fixing cartel related to the supply of rails and other steel products for the German railway system (Deutsche Bahn). The cartel coordinated prices and divided up contracts for several years. ThyssenKrupp was fined €103 million by the German Federal Cartel Office (Bundeskartellamt). Additionally, Deutsche Bahn sought damages in civil court, leading to further financial penalties.

e. **The German Steel Quarto Plate Cartel (2019)**:  In Germany, the Bundeskartellamt has imposed fines totaling around €646 million on Ilsenburger Grobblech GmbH, ThyssenKrupp Steel Europe AG and voestalpine Grobblech GmbH as well as three individuals responsible for exchanging information on and agreeing certain price supplements and surcharges for quarto plates a kind of steel used for construction, bridges, ships and pipelines. The illegal agreement was practiced from mid-2002 until June 2016.

f. **ThyssenKrupp and Tata Steel Merger (2019):** ThyssenKrupp and Tata Steel announced their plans to merge their European steel operations in September 2017, aiming to create a joint venture called ThyssenKrupp Tata Steel. The joint venture was expected to have a capacity of around 21 million tonns of steel per year, with annual sales of approximately €15 billion.  The European Commission blocked the merger primarily due to concerns that it would lead to reduced competition in the European steel market, specifically in the Automotive Steel, Metal Packaging, and Specialty Steel Products industries.

**The Conspiracy**

**41.**     The illegal conduct was orchestrated by high-level executives at the ThyssenKrupp defendants, Aceros, CBM, CB and SSS, including Acero's former Interim President, Juan C. Aponte-Tolentino, who has already pled guilty to the charges of price-fixing, as detailed in the press release issued by the United States Department of Justice on August 7, 2024 . (USA v. Aponte-Tolentino, (3:24-cr-00261)).

**42.**     The collusion between the defendants involved in a sophisticated price-fixing scheme that controlled the steel rebar market in Puerto Rico. The conspirators called themselves "La Cosa Nostra" of the steel industry in the region, causing widespread economic harm to consumers and businesses.

**43.**     Through their ownership and control over Aceros, CBM, CB, and SSS, they manipulated the market to their advantage, stifling competition, and harming consumers by imposing unjustifiably high prices for steel products.

**44.**     From January 2015 until November 2022, the Defendants, acting as a cartel, engaged in secretive communications through phone calls, in-person meetings, and WhatsApp messages to discuss and agree upon the prices at which they would sell rebar ("varilla" in Spanish) and other steel products in the market. These discussions were part of a coordinated effort to fix prices, allocate market and customers thereby eliminating competition.

**45.**     The rebar cartel orchestrated a comprehensive price-fixing conspiracy that dominated the product's market in Puerto Rico. By controlling over 70% of the market, they effectively eliminated competition and manipulated prices to maintain and increase their market share and profitability.

**46.**     The cartel orchestrated a reduction in steel shipments to Puerto Rico, creating an artificial scarcity that justified further price increases. This strategy not only inflated prices but also maximized their profits at the expense of Puerto Rican consumers and businesses.

**47.** The defendants' actions have resulted in substantial harm to the steel market in Puerto Rico, driving up prices, stifling competition, and creating a monopoly that has deprived consumers of fair and competitive pricing.

**48.** Francisco García-Alonso, when president and owner of SSS, participated in the price-fixing scheme with the other Defendants. However, after his death on July 11, 2022, his son took over the business and continued as an active member of the conspiracy, ensuring the continuation of the illegal cartel activities.

**49.** The cartel not only fixed prices but also manipulated the supply of steel products by purposely reducing the importation of steel products into Puerto Rico to create an artificial lack of supply. This artificial reduction in supply created a false scarcity in the market, allowing the Defendants to justify significant price increases to their customers.

**50.** Documents reveal that at the onset of the conspiracy, the agreed to price of rebar was $25.50 per quintal, and by 2022, the price had risen to $54.00 per quintal, a direct result of the Defendants' collusive activities.

### The "La Cosa Nostra" Chat

**51.** On or about August 20, 2015, Aponte-Tolentino and Sola-Colon exchanged a chat message about rebar prices in which the former asked "what price do I put that?" and the latter responded, "25.50?"

**52.** On or about August 10, 2017, the following text message exchange took place between Aponte-Tolentino and Sola-Colon:

> **Sola-Colon**: Good afternoon. The prices of rebar have kept rising internationally and the replacement costs are already over $27.50 per quintal. Starting next Monday, we'll start setting firm prices over $28.00 quintal. Please send this message to your clients so your clients can take advantage of the current prices until tomorrow.
> **Sola-Colon**:: Message to the salesmen.
> **Aponte-Tolentino**: Perfect. Tomorrow, without fail, I will send it out to them so that both of us are on the same page. I just arrived in Mayaguez
> **Aponte-Tolentino**: Bro, that $28.00 is delivered.

**Sola-Colon**: Yes, that is the price we are looking for

53.     On or about September 13, 2017, the following text message exchange took place between

Aponte-Tolentino and Sola-Colon:

> **Aponte-Tolentino**: Listen, I want to ask you, are we going $28.75? Because the cost today is $27.00 for 1,000.
> **Aponte-Tolentino**: I want to start laying the groundwork to buy next week.
> **Sola-Colon**: Most of our orders are between 28.25 and 28.95. Every now and then we toss out a 27.95, but today [Fransico García-Alonso] sold a platform to a client at 26.95
> **Aponte-Tolentino**: Umm, tomorrow after 12:00, I will raise without fail to $28.95cwt same as you. We have sold at $27.95cwt.

54.     In December 2017 Aponte-Tolentino sent Sola-Colon a picture of a sticky note with hand-

written prices on it indicating the price at which the products mut be sold by the cartel members.

55.     On or about June 15, 2018, Aponte-Tolentino and Sola-Colon exchanged the following chat

messages:

> **Aponte-Tolentino**: Bro, at what price should we come out on Monday?
> **Aponte-Tolentino**: Rebar.
> **Sola-Colon**: I am staying steady at 48.95.
> **Aponte-Tolentino**: Ok, then, we will go there.
> **Aponte-Tolentino**: How much did rebar go up?
> **Sola-Colon**: About .50qq
> **Sola-Colon**: I am looking to earn about 20%.

56.     On or about March 9, 2019, Aponte-Tolentino sent a message Sola-Colon telling him not to

forget the price of rebar was at $34. 90 cwt and matching the Dominican price and stated :"To

continue not letting one go by."

57.     On October 27, 2020, Aponte-Tolentino sent Sola-Colon following chat message: "Look you

are hurting the market to $30.50cwt when you can sell it at $32.50cwt. The boys want rebar prices to

be raised so they can sell the street."

58.     Following this message, the Defendants adjusted their prices to $32.50 per quintal, ensuring

uniformity across all companies involved in the conspiracy.

**59.**     In December 2020 Sola-Colon sent Aponte-Tolentino via text message an attachment the price of Turkish rebar. Aponte-Tolentino, "The position is the following: Platform $33.95, 10 bundles $34.50, Fewer than 10 bundles: $34.95" before asking, "The question is are we on the same page?" to which the Sola-Colon responded, "Yes, that is what I am doing."

**60.**     On or about February 15, 2022, Aponte-Tolentino and Sola-Colon exchanged the following chat messages:

> **Aponte-Tolentino**: Look, this shit is going up. I'm thinking of going up to $5 l .95cwt
> **Sola-Colon**: I agree.

**61.**     On or about March 3, 2022, Aponte-Tolentino and Francis Garcia exchanged the following chat messages:

> **Aponte-Tolentino**: IMPORTANT ... I repeat one of the largest producers of billets in the world is Ukraine. We are working towards finding other sources of the supply. Now while the axe comes and goes, we will restrict it. The price for pick up is $54.00qq. Delivery is $54.74qq, subject to availability, credit verification. 10 bundles or fewer is a safety measure in the face of uncertainty. Remember that, just as the situation changed from Friday until today, it could change again tomorrow. The freight went up 17% since August. We are dealing with that. The cost has gone up 8%. I need your protection and solidarity on this matter.
> **Garcia**: Was that for your sellers?
> **Garcia**: I am not selling more than 15 bundles
> **Garcia**: Right now
> **Aponte-Tolentino**: Exactly.
> **Garcia**: On Monday, I cut to 10.
> **Aponte-Tolentino**: In front of uncertainty we have to be careful.
> **Garcia**: And I will raise the price like you.

**62.**     On or about March 3, 2022, Aponte-Tolentino sent Sola-Colon the following chat:

> **Aponte-Tolentino**: The price for pick up is $54.00qq. Delivery is $54.75qq subject to availability, credit verification. 10 bundles or fewer is a measure of protection against uncertainty. Remember that, just as the situation changed from Friday until today, it could change again tomorrow. The freight went up 17% since August. We are dealing with that. The cost has gone up 8%. I need your protection and solidarity on this matter.

**63.**     On or about August 8, 2022, Aponte-Tolentino sent Garcia the following chat: "Do not lower rebar anymore. Please go with the same if you want and let the client decide."

**64.**     These messages illustrate the Defendants' active monitoring and enforcement of the agreed-upon inflated prices, ensuring that no member of the cartel undercut the others, thereby maintaining the artificially high prices.

### The Criminal Proceedings

**65.**     On or about July 21, 2024, Aponte-Tolentino entered into a Plea Agreement with the United States Department of Justice, admitting to participation in the price-fixing conspiracy as outlined in the criminal case <u>USA v. Aponte-Tolentino,</u> (3:24-cr-00261). This Plea Agreement further corroborates the existence and operations of the illegal cartel between Aceros, Steel Services & Supplies, Inc., and ThyssenKrupp AG.

**66.**      The Plea Agreement explicitly details that the Defendants knowingly and intentionally engaged in the conspiracy to fix prices for steel products in violation of federal antitrust laws. The agreement provides evidence of multiple meetings, discussions, and communications where pricing strategies were agreed upon, and efforts were made to ensure adherence to the agreed-upon inflated prices.

**67.**     The Plea Agreement includes explicit admissions by Aponte-Tolentino that the Defendants' actions directly violated the Sherman Act by engaging in a combination and conspiracy to restrain trade and commerce in the steel market. The admissions also confirm that these activities substantially lessened competition in violation of the Clayton Act, leading to higher prices for consumers across Puerto Rico and other affected regions.

**68.**     The admissions made in the Plea Agreement provide a clear and compelling basis for the allegations of price-fixing and market manipulation by the Defendants. These admissions further strengthen the claim that the Defendants violated the Sherman Act and Clayton Act by engaging in anti-competitive conduct that harmed consumers and the overall market.

**69.** Defendants utilized sophisticated methods to conceal their illegal activities, including the use of encrypted messaging applications, coded language, and off-the-books meetings. These methods were intended to avoid detection by law enforcement and to maintain the effectiveness of their price-fixing scheme over several years.

**70.** Defendants not only fixed prices but also agreed on the timing and method of price increases, often coordinating their actions to minimize any potential competitive response from other market participants. These actions ensured that all parties involved in the conspiracy benefited from the artificially high prices at the expense of consumers.

**71.** As a result of these illegal activities, the Defendants significantly distorted the steel market in Puerto Rico and other affected regions, causing substantial financial harm to consumers and businesses who were forced to pay inflated prices for steel products.

## CLASS ACTION ALLEGATIONS

**72.** Plaintiff brings this action as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased steel products from the Defendants at artificially inflated prices as a result of the Defendants' illegal price-fixing conspiracy.

**73.** The Class is so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands.

**74.** There are questions of law and fact common to the Class, including:

    **a.** Whether Defendants engaged in a combination and conspiracy to fix prices in violation of the Sherman Act;

    **b.** Whether Defendants' conduct resulted in higher prices for steel products purchased by Plaintiff and the Class;

    **c.** The appropriate measure of damages sustained by Plaintiff and the Class; and

**d.** Whether Plaintiff and the Class are entitled to injunctive relief.

75. Plaintiff's claims are typical of the claims of the Class, as all members of the Class were similarly affected by Defendants' illegal conduct.

76. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in antitrust and class action litigation.

## CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

77. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

78. Defendants engaged in a contract, combination, and conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

79. The acts done by each of the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

80. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Steel products, thereby creating anticompetitive effects.

81. The anticompetitive acts were intentionally directed at the Puerto Rico market for steel products and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for steel throughout Puerto Rico.

82. The conspiratorial acts and combinations have caused unreasonable restraints in the market for steel products.

83. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Class who purchased steel products have been harmed by being forced to pay inflated, supra-competitive prices for steel products used in construction such as rebar.

**84.** In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

**85.** Defendants' and their co-conspirators' conspiracy had the following effects, among others:

    **a.** Price competition in the market for steel products has been restrained, suppressed, and/or eliminated in Puerto Rico;

    **b.** Prices for steel products sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

    **c.** Plaintiffs and members of the Class who purchased steel products from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

**86.** Defendants' conduct had a substantial effect on interstate and foreign commerce, as the conspiracy directly affected the prices paid by purchasers of steel products throughout Puerto Rico.

**87.** Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for steel products purchased directly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

**88.** The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

**89.** As a direct and proximate result of Defendants' illegal conduct, Plaintiff and the Class have suffered antitrust injury in the form of overcharges for steel products and seek treble damages, and injunctive relief as provided by law.

### COUNT II – VIOLATION OF SECTION 7 OF THE CLAYTON ACT (15 U.S.C. § 18)

**90.** Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

**91.** The acquisition and ownership structure of Aceros by Defendants SSS and ThyssenKrupp substantially lessened competition in the steel distribution market in Puerto Rico and other affected regions, in violation of Section 7 of the Clayton Act.

**92.** This anti-competitive ownership structure enabled Defendants to control prices and exclude competition, causing harm to consumers and the market as a whole.

**93.** As a result of Defendants' conduct, Plaintiff and the Class have suffered antitrust injury and seek relief, including divestiture of Defendants or other appropriate remedies to restore competition.

## COUNT III – VIOLATION OF PUERTO RICO ANTIMONOPOLY ACT

**94.** Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

**95.** During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of steel product in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

**96.** The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for steel products and to allocate customers for steel products in the Puerto Rico.

**97.** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Puerto Rico Antimonopoly Act of 1964. 10 L.P.R.A. § 257 et seq.

**98.** Accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the Class, request as follows:

1. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes; 267.

2. That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

    a. An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

    b. A per se violation of Section 1 of the Sherman Act; and

    c. An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein.

3. Plaintiffs and the members of the Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit, estimated to exceed $500,000,000.00;

4. Plaintiffs and the members of the Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6. Plaintiffs and the members of the Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7. Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8. Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9. Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**RESPECTFULLY SUBMITTED,** in San Juan, Puerto Rico, this 26th day of August 2024.


**CASTAÑER & CÍA PSC**
MAI Center
771 Calle 1, Ste 204
San Juan PR 00920
Fax 1 888 227 5728
Tel 787 707 0802

s/ Alberto J. Castañer-Padró
**ALBERTO J. CASTAÑER-PADRO**
USDC 225706
E-Mail: _alberto@castanerlaw.com_

**Attorneys for Plaintiffs**

**VICENTE LAW LLC**
PO Box 11609
San Juan PR 00910-1609
T. 787 751 8000
F. 787 756 5250


s/ Harold D. Vicente-González
**HAROLD D. VICENTE-GONZÁLEZ**
USDC 117711
E-Mail: _hvicente@vclawpr.com_


s/ Harold D. Vicente-Colón
**HAROLD D. VICENTE-COLÓN**
USDC-PR 211805
E-Mail: _hdvc@vclawpr.com_

**Attorneys for Plaintiffs**